466 So.2d 1317 (1985)
Ted F. DUNHAM, Jr.
v.
ANDERSON-DUNHAM, INC.
No. 84-CA 0724.
Court of Appeal of Louisiana, First Circuit.
February 26, 1985.
Rehearing Denied April 12, 1985.
*1318 John Dale Powers, and David M. Ellison, Jr., Baton Rouge, for Ted F. Dunham, Jr.
Floyd J. Falcon, Jr., Baton Rouge, for Dr. Fred R. Endsley.
Thomas E. Balhoff, Baton Rouge, for Anderson-Dunham, Inc.
Before GROVER L. COVINGTON, C.J., and LOTTINGER and JOHN S. COVINGTON, JJ.
JOHN S. COVINGTON, Judge.
Plaintiff Ted F. Dunham, Jr. (Ted, Jr.) sued a closely-held family corporation, Anderson-Dunham, Inc. (Anderson-Dunham), seeking enforcement of a professional consultant contract, or in the alternative, damages for the contract's breach. Anderson-Dunham filed an answer, reconventional demand and third-party demand (against Dr. Fred Endsley, one of two corporate officers who signed the consultant contract). The trial judge found in favor of defendant on the main demand, dismissing plaintiff's suit, but also dismissed defendant's reconventional and third-party demands. From that judgment, both plaintiff and defendant appeal.
For the reasons hereinafter set forth, we affirm.

BACKGROUND FACTS
Plaintiff's father died testate in 1974. Since then, Ted, Jr., his brother Richard (Dick) and their stepmother Katherine O. Dunham have been, in one manner or another, involved with several closely-held family corporations, including Anderson-Dunham. The senior Dunham's will named Katherine executrix of his estate and Katherine, corporate employee Bill J. Alexander and Fidelity National Bank of Baton Rouge as co-trustees of eight trusts established by the will for his children and grandchildren. Fidelity declined acceptance of the trust and Louisiana National Bank of Baton *1319 Rouge was appointed in its place. In October, 1981, the Louisiana Supreme Court removed Katherine from her position as executrix and both Katherine and Bill Alexander from their positions as trustees, on the grounds of breach of their fiduciary duties. See Succession of Dunham, 408 So.2d 888 (La.1981).
In February of 1982, Dr. Fred Endsley was appointed executor of the Dunham estate by Judge Lewis Doherty, as well as co-trustee of the eight testamentary trusts. Louisiana National Bank having resigned as co-trustee, the other co-trustee working with Dr. Endsley was Baton Rouge Bank & Trust Company, represented by its trust officer, J. Cooper Harrell. In his capacity as executor, Dr. Endsley exercised the voting rights of the Dunham succession. In regards to Anderson-Dunham, Dr. Endsley exercised voting control as majority shareholder. Leon Gary was appointed legal counsel for the estate by Judge Doherty.
Sometime in March, 1982, Dick Dunham loaned Endsley $6,500. In April or May, the board of directors of Anderson-Dunham elected Endsley as President and Chief Executive Officer of the corporation. Shortly thereafter, Dick Dunham became Endsley's administrative assistant. In June, Ted, Jr. co-signed a loan with Endsley for $25,000, to finance formation of Endsley's new business, Comprehensive Marketing Services, Inc. (CMSI). In return, Ted, Jr. received 300 shares (out of 1,000 issued) of CMSI stock. On August 2, 1982, shareholders of Anderson-Dunham met and changed its board composition. The new board members were Ted, Jr.; his wife Sara; Katherine O. Dunham; Dr. Endsley; and Althea Kahn, Ted, Jr.'s bookkeeper at Winn Rock, Inc., a related Dunham corporation. Ted, Jr. was elected by the board as Chairman and Chief Executive Officer, for which he received no salary. Sometime in August, Ted, Jr. authorized the payment of $10,000 in consulting fees to CMSI for a shopping center feasibility study. The project was performed satisfactorily.
On September 15, 1982, Dr. Endsley was confronted by Leon Gary and forced to remove Ted, Jr. from all positions with Anderson-Dunham. A new board of directors was elected that same day; the members were Dr. Endsley, J. Cooper Harrell, and long-time management employees George Bruce, J.C. Jackson and George Hamilton, Jr. After that meeting, Hamilton drove Dr. Endsley to Ted, Jr.'s home so that Endsley could inform Ted, Jr. of his removal. According to Endsley, he proposed to Ted, Jr. the execution of a professional consultant contract at that time, in Hamilton's presence. Hamilton did not recall the discussion.
Dr. Endsley and Ted, Jr. testified that the contract was drawn up by the law offices of Ted, Jr.'s attorney, David Ellison, at the direction of Ted, Jr. Ted, Jr. presented the contract to Endsley on September 20th, after the new board had met. At that board meeting, Endsley was elected Chairman and Chief Executive Officer. At the same time, the board elected J.C. Jackson Executive Vice President and Chief Operational Officer; the board also adopted a resolution delegating substantial powers and responsibilities from Dr. Endsley to Mr. Jackson. As it pertains to this litigation, the resolution reads as follows, in part:
"... Fred R. Endsley, as Chairman and Chief Executive Officer of the corporation, does delegate to J.C. Jackson, Executive Vice President and Chief Operational Officer, the following duties and responsibilities:
. . .
(B) Employ such personnel and employees and retain professional consultants and assistance as in his sole opinion the corporation may need to perform its function at such salaries and/or other forms of compensation and for such terms, whether by contract of employment or otherwise, as he solely deems proper and to terminate such employment or to provide for the termination thereof at his descretion [sic] and on the terms he believes appropriate...."
This power was delegated to Jackson as the result of an agreement between Dr. Endsley and J. Cooper Harrell. Dr. Endsley *1320 had prepared a resolution with substantially similar language which would have conferred the powers listed upon himself. At the urging of Mr. Harrell, Dr. Endsley agreed that he would be better able to concentrate on wrapping up the Dunham succession if he delegated these powers to Jackson.
Dr. Endsley testified that in addition to realizing the need for Ted, Jr.'s managerial input into Anderson-Dunham, he had also become convinced that Hamilton and Jackson needed employment contracts to guarantee their security, reward their past service, and ensure their continued loyalty to the corporation, in light of the constant infighting among the Dunham heirs for corporate control. He discussed these proposed contracts with Hamilton and Jackson between September 15th and 22nd. As for Ted, Jr.'s contract, Dr. Endsley discussed its legality with attorney Ellison on September 21, and being satisfied, arranged a meeting for the 22nd with Ted, Jr., Hamilton, himself and Jackson, to execute all three contracts.
It is certain that both Jackson and Hamilton arrived at the September 22nd meeting knowing that employment contracts for each of them would be presented by Dr. Endsley for their approval. However, the testimony is contradictory as to whether Jackson knew in advance that Ted, Jr. would be at the meeting and that Endsley had prepared a contract for consultant services by Dunham which he wanted Jackson to sign on behalf of Anderson-Dunham. The trial judge concluded that Jackson was unaware of the proposed consultant contract until it was presented to him on September 22nd, and we cannot say that the trial court's conclusion was in error.
On September 22nd, the "Professional Consultant Contract" at issue in this suit was executed between Ted, Jr. and Anderson-Dunham, represented specifically, according to the contract document in this record, by J.C. Jackson. The contract was also signed by Dr. Endsley. In exchange for his services as consultant, the corporation agreed to pay Ted, Jr. the sum of $7,850.00 per month, said fee to be adjusted quarterly by reference to the cost of living index. The length of the contract was for ten years. In addition, the contract provided for various fringe benefits. Employment contracts were also executed at this meeting for Hamilton and Jackson. It was agreed among the men that a similar employment contract for George Bruce would be drawn up and executed the next day, and that was in fact done.
On September 24, 1982, Dr. Endsley notified Judge Doherty of his resignation as executor and co-trustee. On September 29th, he filed his formal resignation from the succession with the court, and also notified Anderson-Dunham of his resignation as corporate officer and director. On October 1, 1982, the board met, accepted Endsley's resignation, and repudiated Ted, Jr.'s contract. On January 11, 1983, Ted, Jr. filed the instant suit.
The issues presented for our consideration are: (1) whether the contract was signed by an officer with the requisite authority to bind the corporation; (2) whether that officer's consent was vitiated by duress; (3) whether the trial court erred in refusing to allow defendant to introduce into evidence two pretrial depositions of Dr. Endsley; (4) whether the contract is invalid as a result of Dr. Endsley's failure to disclose to the board of directors his financial dealings with Ted, Jr.; (5) whether the apparently prescribed debts of Ted, Jr. to the corporation, urged in defendant's reconventional demand, had been acknowledged; and (6) whether the trial court erred in dismissing defendant's third-party demand for indemnification against Dr. Endsley.
I. WAS ANDERSON-DUNHAM BOUND BY AN OFFICER WITH PROPER AUTHORITY?
The trial court held that J.C. Jackson had the actual authority to execute the consultant contract with Ted, Jr. on behalf of the corporation. For the following reasons, we concur in the trial judge's determination that actual authority existed.
Actual, express authority of corporate officers stems from statute, articles of incorporation, by-laws, or resolutions of the *1321 board of directors. Harry G. Henn, Law of Corporations, § 224 (2d ed. 1970). Section 5(b) of Anderson-Dunham's by-laws grant the board of directors the power "to confer on any officer of the corporation the power of selecting, discharging or suspending agents, clerks, assistants and employees, and to fix their duties and emoluments. . .". By resolution unanimously adopted by the board of directors on September 20, 1982, Jackson, then Executive Vice President and Chief Operational Officer, was vested with broad "hiring and firing" powers, including the power to retain professional consultants "by contract of employment or otherwise", on whatever terms he deemed proper.
Defendant contends in brief that the president of a corporation lacks the authority to bind the corporation as to "extraordinary and unusual" contracts absent express authority granted by the charter, by-laws or resolution of the board of directors. We concede the validity of this principle of law, but find it has no applicability to the circumstances of this case. Defendant attempts to apply this principle to Dr. Endsley, arguing that he had no authority to bind the corporation with his signature. However, the contract makes it clear that Anderson-Dunham was represented solely by J.C. Jackson, acting pursuant to the express authority granted in the September 20th resolution, a copy of which was attached to the contract. Endsley signed the contract to assuage Jackson's doubts as to his authority, and did not sign as the corporation's representative. Under the September 20th resolution, Jackson had the express authority to bind the corporation in contracts of this type. That being the case, we need not determine whether the terms of the contract were "extraordinary and unusual".
We find no error in the trial court's ruling that J.C. Jackson had the actual authority to bind the corporation on the contract at issue.
II. WAS JACKSON'S CONSENT VITIATED BY DURESS?
Plaintiff contends that the trial court erred in concluding that Jackson's consent was vitiated by duress sufficient to invalidate the contract.
Four requisites are necessary to the validity of a contract: (1) parties legally capable of contracting, (2) their consent legally given, (3) a certain object, which forms the matter of agreement, and (4) a lawful purpose. LSA-C.C. art. 1779. The trial judge concluded that all requisites were met except the element of consent. Citing C.C. art. 1819[1], he determined that although Jackson was never actually threatened, his consent was vitiated by "duress of the circumstances." We agree.
The applicable law is found in former LSA-C.C. arts. 1850 and 1851. Former article 1850 provided:
"Consent to a contract is void, if it be produced by violence or threats, and the contract is invalid."
Former article 1851 provided:
"It is not every degree of violence or every kind of threats that will invalidate a contract; they must be such as would naturally operate on a person of ordinary firmness, and inspire a just fear of great injury to person, reputation or fortune. The age, sex, state of health, temper and disposition of the party, and other circumstances calculated to give greater or less effect to the violence or threats, must be taken into consideration."
The record reveals that at the time the contract was executed, Mr. Jackson was 59 *1322 years old and had been an employee of Anderson-Dunham and/or related companies for 33 years. For the last 8-10 of those years, he was Vice-President of Production of Anderson-Dunham. On September 20, 1982, he was elected to the board of directors of the corporation for the first time. On that same date, he was elected Executive Vice President and Chief Operational Officer and vested with considerable powers, including the "hiring and firing" powers discussed supra.
According to Dr. Endsley, when he presented the contract for Jackson's signature, Jackson hesitated to sign because he didn't understand the extent of his authority, as granted by the September 20th resolution, to act on behalf of the corporation. Hamilton confirmed that Jackson was reluctant to sign the contract, but recalled that his reluctance was based on doubts as to the contract's legality. Hamilton testified that Jackson was not threatened or coerced into signing the contract.
Jackson's testimony was by deposition only. He testified that Hamilton told him about the proposed employment contracts for them both on September 21st, and arranged a meeting to execute the contracts for the following day, September 22nd. On that date, he and Hamilton went to Endsley's office, where he was surprised to discover Ted Dunham, Jr. present as well. There was considerable discussion over the need for Jackson's signature on Ted, Jr.'s contract. Jackson asserted that he resisted signing the contract for "nearly an hour" because: (1) he didn't think his signature was necessary when Dr. Endsley was available to sign for the corporation, and (2) he wanted George Bruce to receive an employment contract similar to his and Hamilton's. It was agreed by all that Bruce would receive a similar contract, and one was executed the following day.
Jackson testified that at that time he didn't realize that he had the requisite authority to sign for Anderson-Dunham, but that it was explained to him that he did by virtue of the September 20th board resolution. He stated at one point in his testimony that he felt he was "under pretty much duress" and that "in a way" he thought he was being pressured to sign. However, he admitted that he "just really didn't know" whether his job would have been jeopardized had he not signed. He admitted that his job was not put on the line, nor was he threatened or coerced in any other manner; he admitted that he could have left the room at any time, that no one required him to sign, and that he eventually signed the contract voluntarily. He stated that he would have "preferred not" to sign it, and would not have done so "but for the continued insistence" of Dr. Endsley and Ted, Jr. He admitted full awareness of the nature and effect of the contract and the significance of his signature.
The trial judge must be given much discretion in resolving an issue of this nature. With the exception of Mr. Jackson, he had the only opportunity to listen to witnesses and to evaluate their credibility. Since Mr. Jackson testified by deposition only, the trial judge had no better opportunity to evaluate his testimony than does this court. However, it is obvious from the oral reasons given by the trial judge at the conclusion of the trial that he based his decision upon the totality of the evidence and the inferences he drew therefrom. The nature of the transaction, combined with the background of the various witnesses and their relationship with each other, leads us to the conclusion that the trial judge was not clearly wrong in concluding there was duress sufficient to invalidate the contract. Arceneaux v. Domingue, 365 So.2d 1330 (La.1978). We attach (as an appendix hereto) the oral reasons of the trial judge. We do not think they are manifestly erroneous as regards the question of duress.
III. SHOULD ENDSLEY'S FAILURE TO DISCLOSE HIS FINANCIAL DEALINGS WITH TED, JR. INVALIDATE THE CONTRACT?
Although we have some difficulty in understanding defendant's arguments on this issue, defendant seems to be contending that the contract should be invalidated because: (1) Dr. Endsley breached his fiduciary *1323 duty as executor and trustee, as well as his duty to the corporation and its shareholders, by secretly "orchestrating" the contract; and (2) Under LSA-R.S. 12:84[2], directors have a duty to disclose all material facts of contracts which they enter into with the corporation to the board, or such contracts may be voidable. LSA-R.S. 12:84 is clearly not applicable to the facts of this case because the contract at issue is not between the corporation and one of its officers or directors. Defendant's vague assertions of fraud by Dr. Endsley cannot be considered by this court since fraud, an affirmative defense, must have been pleaded with particularity in defendant's answer. LSA-C.C.P. art. 1005. Defendant's answer contains no such pleading and we will not consider arguments of fraud.
The board of directors having expressly granted Jackson the authority to bind the corporation in contracts of this nature, and Jackson having signed the contract as the representative of Anderson-Dunham, Dr. Endsley's signature was superfluous. In any event, even if Dr. Endsley's actions in any way constituted a breach of fiduciary obligations, such breach is not directly relevant to the dispositive issues in this case.
IV. DID THE TRIAL COURT ERR BY REFUSING TO ADMIT INTO EVIDENCE ENDSLEY'S PRETRIAL DEPOSITIONS IN THEIR ENTIRETY?
Defendant sought to introduce into evidence the entire transcripts of two pretrial depositions of the third-party defendant, Dr. Endsley. These depositions were used for attempted impeachment of his testimony during cross-examination. Defendant argues that the trial court committed manifest error in refusing to allow introduction of the depositions in their entirety, on the ground that Dr. Endsley was present in court for cross-examination.
LSA-C.C.P. art. 1450(2) provides, in pertinent part:
"The deposition of a party ... may be used by an adverse party for any purpose."
In support of its contention, defendant cites Verrett v. Preston, 374 So.2d 121 (La.App. 1st Cir.1979), which held that the discovery deposition of a party litigant may be used by the adverse party for any purpose whether the party deposed is present and testifies or whether an express purpose is given for its introduction.
While we do not subscribe to the view that the trial judge is without discretion in ruling on the admissibility of deposed testimony, we believe the trial court erred in this particular instance. The purpose for which the depositions were offered was broad enough to make relevant the entire depositions. We have, therefore, considered these depositions in evaluating all the evidence in this case. Cf. Harrison v. State, Dept. of Highways, 375 So.2d 169 (La.App. 2d Cir.1979); Olivier v. Ourso, 308 So.2d 811 (La.App. 4th Cir.1975).
*1324 V. WAS PRESCRIPTION OF DEBTS ASSERTED IN DEFENDANT'S RECONVENTIONAL DEMAND INTERRUPTED BY TED, JR.'S ACKNOWLEDGEMENT?
Defendant filed a reconventional demand against Ted, Jr., alleging his liability to the corporation for $48,999.73 in personal advances and $40,000 on a promissory note. In brief, defendant admits that these asserted debts are prescribed on their face, but argues that Ted, Jr. acknowledged these debts in a lawsuit filed June 17, 1983 against Katherine O. Dunham and the succession of his deceased father, currently pending in district court. In that suit, Ted, Jr. apparently requests indemnification from the defendants for certain debts he incurred for the benefit of his deceased father or for the various Dunham corporations.
The petition was not entered into evidence, and only one paragraph from the petition was read into the record by the defendant; Ted, Jr. did not even acknowledge that the paragraph read by defendant's attorney was a true statement of the pleadings he filed in the case. Defendant states that the trial judge examined the record of the suit, and requests that we do the same. Unfortunately, we are unable to do so, since defendant failed to introduce the pleadings into evidence.
Accordingly, we find that defendant has failed to prove acknowledgement by Ted, Jr. sufficient to interrupt prescription. We, of course, pretermit any consideration of whether the amounts at issue in the reconventional demand were personal obligations of Ted, Jr.
VI. DID THE TRIAL COURT ERR IN DISMISSING DEFENDANT'S THIRD-PARTY DEMAND AGAINST DR. ENDSLEY?
Defendant's third-party demand against Dr. Endsley apparently requests indemnification from him in the event the contract with Ted, Jr. is held valid and enforceable. Since we concur with the trial judge in holding the contract was vitiated by lack of consent due to duress, it is unnecessary for us to address this issue.
Accordingly, for the foregoing reasons, the trial court's judgment is affirmed in all respects.
AFFIRMED.

APPENDIX
BY THE COURT:
ALL RIGHT, I THINK THE REMARKS BY MR. ELLISON ARE TRUE TO SOME EXTENT, THAT A LOT OF THE THINGS THAT THE COURT LET IN WERE NOT REAL RELEVANT TO THE DETERMINATION AS TO THE LEGALITY OF THIS CONTRACT. I WANTED TO HAVE A FULL HEARING, AND I THINK THE RECORD IS COMPLETE, AND A LOT OF IT HAD SOME RELEVANCE, NOT MUCH BUT SOME, OTHER TESTIMONY HAD MORE.
OF COURSE, THE HISTORY OF THIS DUNHAM MATTER GOES BACK TO THE DEATH OF TED, SR., APRIL 17TH, 1974, HIS ESTATE HAS BEEN IN THE HANDS OF THE EXECUTORS SINCE THAT TIME. THE HISTORY OF THAT SUCCESSION AND THE TERMINATION OF ITS FIRST EXECUTRIX IS FOUND IN THE CASE OF SUCCESSION OF DUNHAM, 408 SO.2D 880 OR 888, I'M NOT SURE WHICH. THAT GIVES A HISTORY FROM '74, YOU MIGHT SAY, UNTIL LATE '81 AND THEN WE COME UPON THE SCENE AS FAR AS THIS CASE IS CONCERNED. EVIDENCE REVEALING THAT IN LATE '81 JUDGE DOHERTY WAS SEEKING A NEW EXECUTOR TO REPLACE KATHERINE DUNHAM AND ON THE RECOMMENDATION OF DEAN ROSS, OR FORMER DEAN ROSS, COLLEGE OF COMMERCE AT LSJ HE SPOKE TO DR. FRED ENDSLEY IN DECEMBER OF '81 AND IN FEBRUARY OF '82, OFFICIALLY APPOINTED HIM EXECUTOR OF THE DUNHAM SUCCESSION AND CO-TRUSTEE ALONG WITH THE BATON ROUGE BANK, WHO WAS REPRESENTED BY J. COOPER HARRELL. I THINK LNB, THE FORMER CO-TRUSTEE, HAD RESIGNED. JUDGE DOHERTY, THROUGH HIS TESTIMONY, MADE IT *1325 CLEAR THAT HE INSTRUCTED DR. ENDSLEY WHAT HEWHAT THE COURT WANTED. THE COURT WANTED SOMEONE TO GO IN AND TRY TO CONCLUDE THIS SUCCESSION, DIDN'T WANT THE EXECUTOR AND CO-TRUSTEE TO TAKE SIDES, WANTED HIM TO REMAIN INDEPENDENT AND NEUTRAL SO HE WOULDN'T BE OBLIGATED OR INDEBTED TO DO SOMETHING FOR SELF-INTEREST. THAT WAS THE WHOLE THRUST, AS I GATHER, OF JUDGE DOHERTY'S CONVERSATION WITH DR. ENDSLEY, THOUGH IT IS CORRECT, AS STATED BY MR. ELLISON, NO SPECIFIC ONE, TWO, THREE ORDERS WERE GIVENAND ALSO BY MR. FALCON. HE ALSO APPOINTED, AT THAT TIME, MR. LEON GARY TO BE THE ATTORNEY FOR THE EXECUTOR AND THE TRUSTEE, DR. ENDSLEY, AND I THINK THE RECORD IS CLEAR AND COUNSEL HAS REITERATED THE RECORD IN THEIR ARGUMENTAND REALLY THERE'S NOTTHERE'S HARDLY ANY DISPUTE ABOUT WHAT HAPPENED IN THIS MATTER. I MEAN IT'S ALLTHERE'S NO GREAT FACTUAL DETERMINATION FOR THIS COURT TO MAKE AS TO WHAT HAPPENED, FEW LITTLE AREAS BUT NO REAL SIGNIFICANT AREAS ARE IN DISPUTE. DR. ENDSLEY WENT IN AND, OF COURSE, HAD SOME CONTACT WITH DICK AND MADE A LOAN, NOTHING ILLEGAL ABOUT THAT. YOU MIGHT SAY IT WAS CONTRARY, POSSIBLY, TO THE DIRECTION GIVEN BY JUDGE DOHERTY TO HIM AND IT CERTAINLY GAVE BAD APPERANCES AS TO WHAT FOLLOWED WHAT FOLLOWED THE LOAN WAS DR. ENDSLEY, WHO HAD FULL CONTROL OF THE STOCK, AT LEAST HAD THE MAJORITY VOTE, COULD DO WHAT HE WANTED AS FAR AS APPOINTING THE DIRECTORS CHANGED THE BOARD, ACCORDING TO THE TESTIMONY. AS I RECOLLECT IT MR. JACKSON WAS ONE OF THOSE BOARD MEMBERSWAS ON THE BOARD OF DIRECTORS WHEN HE WENT IN. HE REMOVED MR. JACKSON AND APPOINTED DICK AND DICK'S SON AND MAYBE ONE OTHER APPOINTMENT, BUT HE REMOVED MR. ALEXANDER, WHO WAS THE FORMER TRUSTEE AND, I GUESS, CHIEF EXECUTIVE OFFICER OF THE CORPORATION AT THAT TIME. HE REMOVED ALEXANDER, JACKSON AND GEORGE BRUCE. DICK WAS LATER MADEAND I DON'T KNOW WHETHER HIS TITLE WAS EVER PROVED BY A PREPONDERANCEHE WAS MADE SOME ADMINISTRATIVE ASSISTANT OR SOME EXECUTIVE OFFICER OF SORTS, WAS NOT RECEIVING ANY SALARY AS SUCH, BUT HE WAS INVOLVED AGAIN IN THE OPERATIONS OF THE CORPORATIONS FOR SOME SHORT PERIOD OF TIME, FROM JUNE MAYBE THROUGH JULY OF 1982. PRIOR TO THAT TIMEAND I'M SURE IT WAS INEVITABLE THAT DR. ENDSLEY WOULD MEET WITH TED DUNHAM, WOULD MEET WITH KATHERINE DUNHAM, WOULD MEET WITH DICK DUNHAM, YOU MIGHT SAY, OF COURSE, THE DUNHAM CORPORATION THEY HAD BEEN WITH ALL OF THEIR LIVES AND ITI'M SURE THEY FIND IT STRANGE, EVEN TODAY AND IT IS STRANGE AND IRONIC THAT THE DUNHAMS CAN'T RUN THE DUNHAM CORPORATIONBUT MR. GARY MENTIONED, I THINK, IN HIS TESTIMONY, OF COURSE, MR. DUNHAM, SR. CAN MAYBE TAKE CREDIT FOR THIS BY HIS DISPOSITION HIS TESTAMENT AND FOR WHATEVER REASONS HE DEEMED PERTINENT HE TOOK THE ACTIVE MANAGEMENT AWAY FROM HIS SONSBUT, ANYWAY, THE HISTORY HAS SOME RELEVANCE IN DEALING WITH THE REAL ISSUE BEFORE THE COURT, THIS CONTRACTTHIS CONSULTING CONTRACT WITH TED DUNHAM.
THE RECORD REVEALS THAT THERE WAS SOME BUSINESS DEALINGS BETWEEN DR. ENDSLEY AND TED DUNHAM, CO-SIGNED A NOTE, *1326 GOT SOME STOCK FOR THAT, INITIATED A CONTRACT WITH COMPREHENSIVE MARKETING THROUGH ANOTHER ONE OF THE DUNHAM COMPANIES AND MAYBE I MISSED ONE OTHER MATTERBUT THOSE ARE NOT ILLEGAL ENDEAVORS IN MY OPINION. THEY VIOLATED THE DIRECTION THE COURT GAVE TO DR. ENDSLEY AS TO HOW HE SHOULD CONDUCT HIMSELF BUT AS FAR AS BEING ILLEGAL I DON'T THINK THERE WAS ANY ILLEGALITY TO THOSE MATTERS AS SUCH, BUT DR. ENDSLEY REMOVED, IN LATE JULY/EARLY AUGUST, REMOVED RICHARD AND THAT GROUP FROM THE BOARD, PUT TED IN CONTROL AS THE CHIEF EXECUTIVE OFFICER. DR. ENDSLEY TESTIFIED HE ATTEMPTED TO CONTACT MR. GARY ABOUTHE MUST HAVE THOUGHT MR. GARY'S COUNSEL WAS NEEDED, HE ATTEMPTED TO CONTACT HIM ABOUT IT, WAS UNABLE TO REACH HIM. I DON'T KNOW WHY IT WAS THAT URGENT BUT HE WENT FORWARD AND LEGALLY REMOVED DICK'S GROUP FROM THE BOARD AND INSERTED TED, JR. AND HIS WIFE AND ONE OF THE KEY EMPLOYEES OF LONG STANDING, MRS. KAHNALTHEA KAHN, AND MR. DUNHAM FROM THE EVIDENCE WAS OPERATING FOR ABOUT SIX WEEKS. NO EVIDENCEMAYBE SOME INNUENDO, BUT NO EVIDENCE THAT HE DID ANYTHING WRONG DURING THAT BRIEF SPAN. THEN ALLEGATIONS POPPED UP THROUGH DICK, I THINK, ABOUT TED DUNHAM'S MISAPPROPRIATION OF FUNDS IN WINN ROCK, ANOTHER CORPORATION WITHIN THIS SUCCESSION, AND THIS BROUGHT A, YOU MIGHT SAY, SHOWDOWN MEETING BETWEEN MR. GARY AND DR. ENDSLEY ON SEPTEMBER THE 15TH, IN WHICH HE STRONGLY SUGGESTED THAT DR. ENDSLEY REMOVE MR. DUNHAM FROM ACTIVE PARTICIPATION WITH THE CORPORATION AS FAR AS ITS MONEYS WERE CONCERNED. HE WAS CONCERNED ABOUT MR. DUNHAM HAVING ANY CONTROL OR CONTACT WITH THE FINANCIAL ASPECTS OF ANDERSON-DUNHAM, AND THEY WENT DIRECTLY TO THE CORPORATE OFFICES AFTER THE MEETING BETWEEN DR. ENDSLEY AND MR. GARY AND DR. ENDSLEY RELIEVED TED, JR. AND HIS WIFE AND MS. KAHN AND REPLACED THEM WITH THE CO-TRUSTEE COOPER HARRELL, GEORGE HAMILTON, JACKSON AND BRUCE. LATER MR. HARRELL MET WITH MR. JACKSON AND I THINK DR. ENDSLEY AND DISCUSSED WHERE THEY WERE GOING FROM THERE, AND THAT MR. HARRELL AND DR. ENDSLEY AGREED THAT WE'RE GOING TO NOW LEAVE THE OPERATION OF THE CORPORATION, THE COMPANY, THE BUSINESS, OF ANDERSON-DUNHAM TO THE LONG-TIME EMPLOYEES; JACKSON AND HAMILTON, BUT LET JACKSON PRETTY MUCH RUN IT AND THEY WOULD TRY TO RESOLVE THE OTHER AFFAIRS OF THE SUCCESSION WITH A PROSPECT OF, HOPEFULLY, ONE DAY CONCLUDING THE SUCCESSION AND PUTTING THE ASSETS IN THE VARIOUS TRUSTS. THEREAFTER I THINK THE RECORD IS CLEAR THAT DR. ENDSLEY NOTIFIED TED DUNHAM ABOUT THIS AND THAT HE WAS OUT AS FAR AS THE CHIEF EXECUTIVE OFFICER, AND AT SOME POINT A DISCUSSION WAS MADE ABOUT A CONSULTANT CONTRACT.
AT THE NEXT BOARD MEETING AND I'M CONVINCED THERE WAS SOME DISCUSSION ABOUT A CONSULTING CONTRACT BEFORE THE BOARD MEETING OF SEPTEMBER 20TH, FROM THE TESTIMONY I HEARD, BETWEEN TED DUNHAM, JR. AND DR. ENDSLEY. WHETHER OR NOT THE CONTRACT WAS IN FINAL FORM AT THE TIME OF THE BOARD MEETING OF SEPTEMBER 20 IS NOT CLEAR, IT PROBABLY WAS NOT CONCLUDED, AND IT'S ALSO CLEAR FROM THE TESTIMONY THAT AT THAT BOARD MEETING SOMEONE HAD *1327 COME WITH A PREPARED RESOLUTION TO GIVE DR. ENDSLEY THE AUTHORITY TO HIRE CONSULTANTS, OTHER KEY EMPLOYEES, BUT THAT WAS REJECTED AFTER SOME DISCUSSION SINCE MR. HARRELL HAD CONFERRED WITH MR. JACKSON AND DR. ENDSLEY, IT WAS AGREED THAT THE PLAN WOULD BE TO GIVE MR. JACKSON THE AUTHORITY THAT DR. ENDSLEYAND THAT'S HOW THE RESOLUTION CAME DOWN THAT THIS AUTHORITY WAS DELEGATED TO J.C. JACKSON; EMPLOY SUCH PERSONNEL AND EMPLOYEES AND RETAIN PROFESSIONAL CONSULTANTS AND ASSISTANTS AS, IN HIS SOLE OPINION, THE CORPORATION MAY NEED TO PERFORM ITS FUNCTION AT SUCH SALARIES AND OTHER FORMS OF COMPENSATION AND FOR SUCH TERMS, WHETHER BY CONTRACT OF EMPLOYMENT OR OTHERWISE, AS HE SOLELY DEEMS PROPER, ETCETERA AND THE BYLAWS OF THE CORPORATION SPEAK SPECIFICALLY ON THAT POINT WHERE IT SAYS THAT THE BOARD OF DIRECTORS, FROM THE SECTION-5B; THE BOARD OF DIRECTORS SHALL HAVE POWER TO CONFER ON ANY OFFICER OF THE CORPORATION THE POWER OF SELECTING, DISCHARGING OR SUSPENDING THE AGENTS, CLERKS, ASSISTANTS AND EMPLOYEES AND TO FIX THEIR DUTIES AND EMOLUMENTS AND TO CHANGE THEM FROM TIME TO TIME. THEY WERE IN ACCORDANCE WITH THE BYLAWS, CLEARLY, AND, OF COURSE THE EVIDENCE AT TRIAL INDICATED THAT A WRITTEN CONTRACT WAS PREPARED BY MR. DUNHAM'S ATTORNEY, MR. DAVID ELLISON OR AT HIS OFFICE, AND THAT DR. ENDSLEY NEVER CONFERRED WITH LEON GARY ABOUT THE MATTER AND THAT DR. ENDSLEY CONTACTED MR. HAMILTON AND TOLD HIM ABOUT THEM GETTING CONTRACTS FOR HIM AND JACKSON, I THINK THAT WAS ON THE 21ST OF SEPTEMBER 1982 OR THE NEXT DAY. MR. HAMILTON CALLED MR. JACKSON AND PICKED UP MR. JACKSON AND TOLD HIM THEY WERE GOING SIGN THEIR CONTRACTS, HAMILTON AND JACKSON'S CONTRACT. I FORGET THE PLACE WHERE THEY WENT, I GUESS THE CORPORATE OFFICE, I'M NOT SURE ABOUT THAT
MR. ELLISON: DR. ENDSLEY'S OFFICE.
THE COURT: ALL RIGHT, DR. ENDSLEY'S OFFICE.
BY THE COURT:
AND MR. JACKSON WAS SHOWED THE CONTRACTS AND IT'S CLEAR FROM HIS DEPOSITION THAT WAS THE FIRST HE'D EVER BEEN TOLD ABOUT THE CONSULTING CONTRACT WITH TED DUNHAM AND HE PROTESTED, HE DIDN'T WANT TO SIGN IT, HE SIGNED HIS AND SIGNED MR. HAMILTON'S. HE WANTED A CONTRACT FOR MR. BRUCE, THAT WAS ONE OF HIS REASONS FOR PROTESTING BUT HE WAS IN THE COMPANY OF DR. ENDSLEY, WHO HE CONSIDERED A BOSSHIS BOSS, TED DUNHAM JR., WHO HAD RUN THE COMPANY FOR MANY YEARS PRIOR TO 1974MR. JACKSON HAS BEEN WITH THE COMPANY SOME THIRTY-THREE YEARS AND CERTAINLY AS FAR AS HIS PERUSAL OF THE CONTRACT, ON PAGE-17, IT SAYS; "DID YOU SIT DOWN AND REVIEW ALL THREE CONTRACTS"? "WELL, I LOOKED AT THEM BUT I DIDN'T REALLY PAY A LOT OF ATTENTION TO THEM." HE NOTICED THE SALARY LEVEL OF THE CONTRACT AND LATER TESTIFIED IN HIS DEPOSITION THAT HE DIDN'T CONSIDER IT ANY MORE THAN WHAT WAS BEING MADE BY MR. ALEXANDER, I THINK, WHO FORMERLY WAS A CHIEF OPERATING OFFICER WITH THE CORPORATION BUT, CERTAINLY, HE DIDN'T STUDY THE CONTRACT, HE DIDN'T PREPARE THE CONTRACT, IT WAS NOT IN HIS SOLE OPINION THAT THESE PROFESSIONAL CONSULTING SERVICES *1328 WERE NEEDED, THOUGH HE TESTIFIED CLEARLY THAT HE HAD GREAT FAITH IN TED DUNHAM JR.'S ABILITY, THERE'S NO QUESTION ABOUT THAT, BUT THE CONTRACT, OF COURSE, WAS NOT HIS SOLE TERMS AND THE RESOLUTION WAS GIVEN TO HIM SPECIFICALLY IN THAT REGARD. HE SIGNED IT AFTER NEARLY AN HOUR, ACCORDING TO HIS TESTIMONY, HE WAS NOT THREATENED WITH WORDS, SIGN IT OR ELSE, CLEARLY THAT WAS NOT DONEBUT HE CERTAINLY, IN MY OPINION, WAS UNDER THE DURESS OF THOSE CIRCUMSTANCES. CONTRACTS ARETHIS IS, YOU KNOW, A CONTRACT LIKE ANY OTHER CONTRACT AS FAR AS THE LEGALITY OF IT IS CONCERNED, 1799 SAYS; "FOUR REQUISITES ARE NECESSARY TO THE VALIDITY OF A CONTRACT, PARTIES LEGALLY CAPABLE OF CONTRACT" I THINK WE HAVE THAT, THERE WERE NO MINORS INVOLVED, I THINK HE WAS LEGALLY CAPABLE OF CONTRACT AND THEIR CONSENT LEGALLY GIVEN"A CERTAIN OBJECT WHICH FORMS THE MATTER IN A LAWFUL PURPOSE", I THINK THERE WAS A CERTAIN OBJECT AND A LAWFUL PURPOSE. THE CONSENT IS THE FINAL QUESTION AND IT SAYS UNDER 1819, "WHAT DEFECTS OF CONSENT WILL INVALIDATE A CONTRACT, CONSENT BEING THE CONCURRENCE OF INTENTION IN TWO OR MORE PERSONS WITH REGARD TO A MATTER UNDERSTOOD BY ALL, RECIPROCALLY COMMUNICATED AND RESULTING IN EACH PARTY, FROM A FREE AND DELIBERATE EXERCISE OF WILL. IT FOLLOWS THAT THERE'S NO CONSENT NOT ONLY WHERE THE INTENT HAS NOT BEEN MUTUALLY COMMUNICATED OR APPLIED AS IS PROVIDED IN THE PRECEEDING PARAGRAPH BUT ALSO WHERE IT HAS BEEN PRODUCED BY ERROR, FRAUD, VIOLENCE OR THREATS", AND II THINK THE RECORD SPEAKS LOUD AND CLEAR THAT THIS CONTRACT WAS NOT FREELY ENTERED INTO BY MR. JACKSON, WHO HAD THE AUTHORITY TO SIGN THAT CONTRACT. I THINK HE WAS UNDER THE DURESS OF THE CIRCUMSTANCES AND WAS PRESSURED I MEAN ULTIMATELY PRESSURED INTO SIGNING THE CONTRACT. HE TOOK AN HOUR AND FINALLY HE RELENTED AND SAID I'LL SIGN IT, AND HE HAD MISGIVINGS FROM THE TIME HE WENT IN THERE UNTIL HE TURNED IT BACK IN TO MR. HARRELL A COUPLE OF DAYS LATER, DIDN'T SLEEP AT NIGHTAND HE'S THE ONLY WITNESS THAT WAS NOT LIVE BUT HIS DEPOSITION IS LIVE AND CLEAR AND UNEQUIVOCAL, IN THIS COURT'S APPRECIATION OF HIS TESTIMONY, THAT IT WAS NOT A CONSENT FREELY GIVEN AND THAT IT WAS UNDER DURESS BY THOSE CIRCUMSTANCES. I THINK HE WAS CERTAINLY FEARFUL OF HIS POSITION, HAVING BEEN THERE FOR THIRTY-THREE YEARS AND ALSO WAS NOT WANTING TO OFFEND HIS HIS BOSSES, DR. ENDSLEY AND TED DUNHAM JR. SO I DON'T THINK IT WAS A VALID CONTRACT, DR. ENDSLEY SIGNED IT BUT I DON'T THINK HIS SIGNATURE MADE IT VALID. I THINK IT WAS CLEAR THAT THE BOARD, TWO DAYS PRIOR, HAD GIVEN THE AUTHORITY TO MR. JACKSON. QUITE FRANKLY, IF MR. JACKSON WOULD HAVE REVIEWED THAT CONTRACT AND ARTICULATED REASONS WHY THIS CONTRACT WAS A GOOD ONE FOR THE CORPORATION A DIFFERENT RESULT MAY WELL APPLY. MR. COOPER, OBVIOUSLY, HAD CONFIDENCE IN MR. JACKSON'S ABILITY AT THAT POINT AND GAVE HIM THE AUTHORITY BUT THAT WAS NOT HIS CONTRACT, HE DIDN'T CONSENT TO IT AND IT IS NOT VALID, IN THE OPINION OF THIS COURT, FOR LACK OF HIS CONSENT.
THE QUESTION OF THE RECONVENTIONAL DEMAND, THEEVERYBODY SEEMED TO TALK ABOUT IT KIND OF LIGHTLY, I DON'T KNOW, MR. ELLISON DIDN'T MENTION IT SPECIFICALLY *1329 IN HISIN HIS BRIEF AS SUCH. CLEARLY, THERE WERE TWO OBLIGATIONS PRESCRIBED ON THEIR FACE, ONE IS A RUNNING LOAN, A BORROWING, BY TED, FROM THE CORPORATION OVER A PERIOD OF YEARSPRESCRIPTION FOR THAT, OF COURSE, IS THREE YEARS. LONG SINCE PRESCRIBED ON ITS FACE. THE NOTE HAS A PRESCRIPTION OF FIVE YEARS, HAS LONG SINCE PRESCRIBED ON ITS FACE. THERE IS SUCH A THING AS ACKNOWLEDGEMENT BUT IT HAS TO BE SPECIFIC AND CLEAR, YOU HAVE TO RE-OBLIGATE YOURSELF TO THE DEBT. I DON'T THINK THE REFERENCES IN THAT OTHER SUIT ACCOMPLISH THAT, IN MY OPINION, AND I DENYI THINK THE RECONVENTIONAL DEMAND HAS PRESCRIBED. I REJECT THE PLAINTIFF'S ORIGINAL DEMAND AND THE THIRD PARTY DEMAND BY THE DEFENDANT AGAINST DR. ENDSLEY AND ALSO I REJECT THE RECONVENTIONAL DEMAND OF THE DEFENDANT AND THE PLAINTIFF IS TO PAY THE COST OF THE PROCEEDINGS AND I'LL SIGN JUDGMENT ACCORDINGLY, GENTLEMEN.
NOTES
[1] Titles III (Of obligations) and IV (Of conventional obligations) of the Louisiana Civil Code, consisting of Articles 1756 through 2291, were revised, amended and reenacted by Acts 1984, No. 331, § 1, effective January 1, 1985.

Former LSA-C.C. art. 1819 provided:
"Art. 1819. Consent being the concurrence of intention in two or more persons, with regard to a matter understood by all, reciprocally communicated, and resulting in each party from a free and deliberate exercise of the will, it follows that there is no consent, not only where the intent has not been mutually communicated or implied, as is provided in the preceding paragraph, but also where it has been produced by
Error; Fraud; Violence; Threats."
[2] LSA-R.S. 12:84 provides:

"A. No contract or transaction between a corporation and one or more of its directors of officers, or between a corporation and any other business, nonprofit or foreign corporation, partnership, or other organization in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was approved in good faith by vote of the shareholders; or
(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders.
B. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the board of directors or of a committee which authorized the contract or transaction."